# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DEMTRIUS MORTON,     )
             )
     Plaintiff,   )
             )
     v.     )   16 C 9883
             )
TEAMSTERS LOCAL 710, TEAMSTERS )
JOINT COUNCIL 25, and JOHN T. COLI, )
SR.,           )
             )
     Defendants.  )

## MEMORANDUM OPINION

**CHARLES P. KOCORAS, District Judge:**

Before the Court is Defendants John T. Coli, Sr. ("Coli"), Teamsters Joint Council 25 ("Joint Council 25"), and Teamsters Local 710's ("Local 710") (collectively "Defendants") Motion to Dismiss ("Motion") much of Plaintiff Demtrius Morton's ("Morton") First Amended Complaint ("FAC") pursuant to Federal Rule of Civil Procedure 12(b)(6). For the following reasons, the Court grants Defendants' Motion.

## FACTUAL BACKGROUND

The following facts are taken from Morton's FAC and are assumed to be true for purposes of this Motion. *Murphy v. Walker,* 51 F.3d 714, 717 (7th Cir. 1995). The Court draws all reasonable inferences in Morton's favor. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008).

The central parties are as follows. Morton is a "black, African-American" and former business agent of Local 710. Local 710 is a subordinate body of Joint Council 25, each of which is a labor organization as defined in 29 U.S.C. §§ 402(i) and (j). Headquartered in Mokena, IL, Local 710 represents more than 12,000 members employed in various industries across the Midwest and was a founding local of the International Brotherhood of Teamsters ("IBT"). In 2014, Local 710 was placed under Trusteeship because of it "financial impropriety." Joint Council 25 is comprised of 27 Teamsters Local Unions, including Local 710, and is headquartered in Park Ridge, IL. At all times relevant to this suit, Coli was both the President of Joint Council 25 and, as a result of Local 710's placement into Trusteeship, the Trustee of Local 710.

In 1996, Morton became a member of the IBT and Teamsters Local 744. The same year, Morton was elected Business Agent of Local 744 and became a member of the Teamsters National Black Caucus ("National Black Caucus"), an independent organization affiliated with the IBT, where it appears Morton still sits as a member of the National Black Caucus' Executive Board. In 2010, Local 710 merged with Local 744, and Morton was retained as Business Agent of Local 710. As a Business Agent, Morton travelled to assigned companies to provide representation for Local 710 members. His duties included negotiating contracts, resolving disputes and grievances with management, preparing grievances for arbitrations, organizing

membership for collective action, and keeping members informed and involved with Local 710 activity.

On July 30, 2014, IBT President James P. Hoffa Jr. appointed Coli to preside as President of Joint Council 25 and Trustee of Local 710, where he would manage the local's affairs. At all times relevant to this suit, Coli was Morton's ultimate supervisor. Together with Brian Rainville ("Rainville"), the Executive Director of Joint Council 25, Coli controlled all hiring and firing decisions at Local 710 and directed all personnel policies. Coli and Rainville also personally oversaw Local 710's "most vital tasks," such as "representation," "bargaining," and the installation of other Joint Council 25 staff into managerial roles responsible for the direction of Local 710's affairs. Morton alleges that such decisions were made "in the interests of…Joint Council 25."

Following Coli's appointment as President, Mike and Paul DiGrazia ("the DiGrazias"), Joint Council 25's Organizing Directors, assumed control of organizing responsibilities for Local 710, "ensur[ing that] it aligned with…Joint Council 25 objectives." The DiGrazias subsequently assigned three organizers from Joint Council 25 to Local 710. Joint Council 25 Communications Director William Petty was assigned to direct Local 710's communications, other Joint Council 25 staff were placed on the Local 710 payroll for "unknown duties," and Coli plucked Rupa Baskaran from his own Local 727 to serve as in-house attorney for Local 710.

Additionally, and for the first time, Joint Council 25 required Local 710 staff to campaign for political candidates endorsed by Joint Council 25.

Upon installation as Local 710 Trustee, Coli fired Local 710's legal representation Asher, Gittler & D'Alba, Ltd, replacing the firm with Illinois Advocates, whose legal services came at an "equivalent or greater cost to the membership of…Local 710." Coli's son, Joseph Coli, founded Illinois Advocates "immediately after his graduation from law school in 2012." Illinois Advocates continues to represent all Defendants in this case.

Prior to Coli's Trusteeship, Joint Council 25 was required to pay Local 710 to store its vehicles on Local 710 property and had to use its own vehicles to transport Coli and Mike DiGrazia. Once Coli's Trusteeship began, Joint Council 25 cancelled the paid parking agreements, parked two semi-trailers on Local 710's property without payment, and took exclusive use of Local 710 vehicles for Coli and Mike DiGrazia's use. Local 710 continued to pay for the gas and cleaning expenses of the vehicles used exclusively by Joint Council 25.

Since the beginning of his Trusteeship, Coli has transferred in the neighborhood of 2,000 dues-paying members from Local 710 to his home Local 727 and other Teamsters locals. Around April 2015, the Local 710 membership in the soft drink and beverage industry, with dues worth approximately $1,000,000 per year, was transferred to Coli's Local 727. To facilitate the mass transfer of membership into his home local, Coli allegedly secured employer cooperation through the forgiveness of

months' worth of back dues owed by employers to Local 710.  Around August 2015, Coli attempted to transfer Local 710 members in the food and grocery industry to Local 703, controlled by Thomas Stiede, Vice-President of Joint Council 25.  When Local 710 members discovered the transfer, letters and phone calls were made to IBT to stop the wholesale dismantling of Local 710 into Coli and his Joint Council 25 allies' locals.  The protest forced Coli to cease his food and grocery membership transfer effort.

In early 2015, Morton submitted a request for funding and time-off to attend a February 2015 National Black Caucus meeting in Florida.  Despite this request having always been previously approved – it was common practice, so Teamsters locals could preserve personal vacation time – Morton was told two weeks before the Florida conference that no funding was available to send him and that his time-off request would be denied.  He instead used personal vacation days to attend.  Also in early 2015, Morton requested funding and time-off to attend a separate National Black Caucus meeting, this one scheduled for August 2015 in Nevada.  This request had similarly always been approved in the past, but in July or August 2015, Morton was again told that no funding would be available and he would have to use personal vacation days to attend.  Around the same time that Morton's second request was denied, Local 710 paid for time-off, travel, hotel, registration fees, and per-diem for four white female members to attend the Teamsters Women's Caucus meeting in August 2015 in Massachusetts.

In the summer of 2015, Gary Abrahamson, who handled the day-to-day management of Coli's Business Agents, ordered Morton to stop distributing any business cards with Morton's personal cell phone that included an affiliation with the National Black Caucus. Morton was "incorrectly told" both that Local 700 also prohibited distribution of business cards that had an affiliation with the National Black Caucus and that this was consistent with the policies of other Teamsters locals.

Throughout 2015 and 2016, Morton's representation and bargaining responsibilities were removed by the Trusteeship and vested primarily in white and Latino business agents with less experience and worse work performance, but "who were trusted by…Coli not to 'agitate' the black membership regarding Coli's misappropriation of assets." Beginning in mid-2015 and continuing until his termination, Morton began reporting that his "scheduling and hours" received extra scrutiny not given to other non-black/African American Business Agents. Morton was required to turn in weekly schedules, immediately report any changes in schedule, and report back to the union local office after site visits. White business agents did not have the same reporting requirements. Morton was not given an explanation for these additional requirements and was told by Coli that if he disagreed, he could leave the employment of Local 710.

In early January 2015, Local 710 Business Agents slated Morton to run for Vice-President of Local 710 once Coli left his Trusteeship. The other Business Agents on the Local 710 leadership slate included Mike Rossow, Thomas Coffey, and

Roger Kelley (collectively, the "Morton Slate"). On June 3, 2015, Coli announced at a meeting that the Local 710 Business Agents would be voting anew for an election slate to run for Local 710 leadership. A new slate was then elected that replaced the entirety of the Morton Slate. Prior to the June 3 vote, Coli held private individual meetings to inform other Business Agents that Morton would not be running for Vice-President of Local 710 and Roger Kelley was not to run for President of Local 710, or else Local 710 would be dissolved and have its membership transferred into other Joint 25 Council locals. The Business Agents who were not approached by Coli before the vote were the only Business Agents who did not vote for Coli's preferred slate. Coli's preferred slate won, and the Morton slate was replaced. Within a month or two of the June 3 vote, Coli terminated Mike Rossow as an elected Local 710 Business Agent.

In February 2015, Coli informed Morton that he was trying to diversify Local 710. Because Morton was the only black Business Agent, Coli told him that his job was "safe." When Morton complained about the diminution of his work responsibilities, Coli responded that there was a need to hire more Hispanics and women. In March 2016, prior to Morton's termination, Coli hired Aisha Hurston, an African-American woman with only one year of experience, as a Business Agent. When Morton again asked about his job security, Coli again told him that he was trying to diversify the local and hire more "Hispanics and women." On April 20, 2016, Coli fired Morton due to "financial difficulty" at Local 710. Morton was

replaced by Mike Ramirez, a Latino hired at Morton's equivalent salary, despite Morton's several more years' worth of experience as a Business Agent.

## PROCEDURAL BACKGROUND

On July 22, 2016,[1] Morton filed charges of discrimination with the Illinois Department of Human Rights ("IDHR") and the Equal Employment Opportunity Commission ("EEOC") against Local 710 and Joint Council 25. Morton's charges allege that the disparate treatment in his employment terms and union membership, and his eventual termination and the attempted termination of his union membership, were unlawfully motivated by his race and color.

On December 2, 2016, Morton amended his EEOC charges to include a continuing hostile work environment claim arising from disparate treatment. On March 10, 2017, Morton received a right-to-sue letter from the EEOC against Local 710 and Joint Council 25. Prior to filing his original complaint, Morton alleges that he filed an internal appeal with the IBT regarding his discharge. Per the FAC, Morton's internal appeal has been put on hold until the resolution of all litigation pursuant to Article XX of the IBT Constitution.

On October 20, 2016, five months before receiving his right-to-sue letter, Morton filed an initial three-count complaint against all Defendants. On June 6, 2017, Morton filed his four-count FAC as follows. Count I: racial discrimination against all Defendants in violation of 42 U.S.C. § 1981; Count II: race/color-based disparate

---

[1] The FAC lists the date as "July 22, *2017*" (emphasis added). This appears to be a typo; Exhibits 1 and 2 – copies of the EEOC/IDHR charging documents – plainly show that the charge was filed in 2016.

treatment against Local 710 and Joint Council 25 in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, et seq.; Count III: race/color-based hostile work environment against Local 710 and Joint Council 25 in violation of Title VII; and Count IV: against all Defendants, a violation of §§ 101(a)(1)/(2) and 609 of the Labor Management Relations Disclosure Act ("LMRDA"), codified by 29 U.S.C. §§ 411(a)(1)/(2) and 529. Defendants seek dismissal of Count IV in its entirety, while Joint Council 25 seeks to be dismissed in its individual capacity from all counts.

## LEGAL STANDARD

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) "tests the sufficiency of the complaint, not the merits of the case." *McReynolds v. Merrill Lynch & Co.*, 694 F.3d 873, 878 (7th Cir. 2012). The allegations in the FAC must set forth a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A plaintiff need not provide detailed factual allegations, but must provide enough factual support to raise his right to relief above a speculative level. *Bell Atlantic. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "In conducting our review, we must consider not only the complaint itself, but also…documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice." *Phillips v. Prudential Ins. Co. of America*, 714 F.3d 1017, 1019—20 (7th Cir. 2013).

A claim must be facially plausible, meaning that the pleadings must "allow…the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The claim must be described "in sufficient detail to give the defendant 'fair notice of what the…claim is and the grounds upon which it rests.'" *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient to withstand a 12(b)(6) motion to dismiss. *Iqbal*, 556 U.S. at 678.

## DISCUSSION

Defendants' Motion addresses the counts in reverse order, beginning with Count IV and completing with Count I. We adopt Defendants' organizational structure here.

## I. Count IV: LMRDA §§ 101(a)(1)/(2) and 609 – Failure to Exhaust Administrative Remedies

Defendants first seek dismissal of Count IV in its entirety on the theory that Morton failed to exhaust his administrative remedies. Members of a labor organization bringing suits under the LMRDA "may be required to exhaust reasonable hearing procedures (but not to exceed a four-month lapse of time) within such organization, before instituting legal…proceedings against such organizations or any officer thereof." 29 U.S.C. § 411(a)(4). The Supreme Court has declined, however,

to impose a "universal exhaustion requirement" in LMRDA suits. *Clayton v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.*, 451 U.S. 679, 689 (1981). Rather, the Court has recommended excusal of exhaustion where the remedial process would prove futile, suggesting three case-specific factors for courts to consider in such instances:

> *[F]irst*, whether union officials are so hostile to the employee that he could not hope to obtain a fair hearing on his claim; *second*, whether the internal union appeals procedures would be inadequate either to reactivate the employee's grievance or to award him the full relief he seeks…; and *third*, whether exhaustion of internal procedures would unreasonably delay the employee's opportunity to obtain a judicial hearing on the merits of his claim.

*Id.* (emphasis added). "If any of these factors are found to exist, the court may properly excuse the employee's failure to exhaust." *Id.*

The Seventh Circuit has interpreted the "futility" test as a "fact-specific inquiry, not limited to the Supreme Court's three factors." *Hammer v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.*, 178 F.3d 856, 858 (7th Cir. 1999). "It is well-settled, though, that a plaintiff must show that union hostility is so pervasive that it infects every step of the internal appeals process." *Id.* To avoid dismissal at the 12(b)(6) stage then, Morton must have asserted facts sufficient to permit the inference that his pursuit of administrative remedies would have been futile. *See Lewis v. Local Union No. 100 of Laborers' Int'l Union of N.A., AFL-CIO*, 750 F.2d 1368, 1380 (7th Cir. 1984) ("In a case involving failure to exhaust, the

plaintiff has the burden of alleging facts showing that the intra-union procedures are inadequate under *Clayton*").

On even the most charitable reading of the FAC, Morton utterly failed to satisfy his burden on the pleadings. Morton contends that his FAC establishes an exhaustion of remedies via the following assertion:

> Prior to the filing of this Complaint, Plaintiff filed an internal appeal with the IBT regarding his discharge. Per Article XX of the IBT constitution, this appeal has been put on hold until the resolution of all litigation. Due to the futility of the internal appeals process, this case has satisfied the LMRDA exhaustion of internal union remedies pre-suit requirement.

Distressingly, Morton does not attach Article XX nor any other section of the IBT Constitution to the FAC. However, as a publicly available document, we may take judicial notice of the Teamsters Constitution without converting Defendants' Motion into a motion for summary judgment. *Henson v. CSC Credit Services*, 29 F.3d 280, 284 (7th Cir. 1994). The provision cited by Morton, Article XX, is entitled "Dissolution"; it governs local union dissolution, secession, and disaffiliation. Teamsters Const., Art. XX. Nowhere in Article XX is there any mention of an administrative process for handling grievances and disputes of union members. Rather, it is Article XIX that explicitly governs the remedial process for charges such as Morton's. Teamsters Const., Art. XIX.

The Court is surprised that the FAC would mimic Morton's original complaint in again citing to Article XX of the IBT Constitution, particularly in light of

Defendants' repeated citation to the proper provision in earlier briefing. Nevertheless, we address the exhaustion question without regard to Morton's counsels' failure to educate themselves about the internal proceedings. *See Hammer*, 178 F.3d at 858 ("Union members…have an affirmative duty to educate themselves about the available internal procedures").

Perhaps recognizing the failure of a single, conclusory paragraph in the FAC to demonstrate administrative exhaustion, Morton offers up in his response brief a supplementary suite of factual assertions explaining the futility of the Teamsters' administrative process. However, the new matter raised in Morton's response is just that, new, and it is discussed largely in an effort to expand the Court's field of vision into distinct factual matter not alleged in the FAC. This is improper, and "we will not consider additional information in the response that is inconsistent with the complaint, *expands the plaintiff's case*, or concerns new claims and new topics." *Anzaldua v. Chicago Transit Authority*, 2002 WL 31557622, *3 (N.D. Ill. Nov. 15, 2002) (emphasis added) (*citing Alioto v. Marshal Field's & Co.*, 77 F.3d 934 (7th Cir. 1996)). We are particularly disinclined to entertain new factual matter where Morton had the advent of anticipating Defendants' attacks on the FAC, courtesy of Defendants' original motion to dismiss, and could have drafted his FAC with the failures of the first complaint in mind.

The FAC itself does not allege facts that might suggest a futile remedial process within the Teamsters' organizational structure. Indeed, the FAC alleges

precisely nothing in the way of said remedial process. Allegations of procedure, participants, and timing are absent. Morton fails to sufficiently allege both that he undertook the proper internal appeals procedures and that the remedial process itself would have been futile to undertake. Because Morton has failed to carry his burden in this regard, Count IV is dismissed for failing to exhaust administrative remedies.

## II. Counts I, II, and III: Liability of Joint Council 25

Separate from Defendants' challenge to the viability of Count IV, Joint Council 25, in its individual capacity, seeks to be dismissed from Counts I, II, and III via a series of employment law notions. Joint Council 25 contends that Morton failed to allege facts suggesting that the joint council was Morton's employer, as determined by the five-factor "economic realities" test established in *Knight v. United Farm Bureau Mutual Insurance Co.*, 950 F.2d 377, 378—79 (7th Cir. 1991). Such an employment relationship is required for Title VII actions and frequently attends § 1981 claims. *See* 42 U.S.C. § 2000e-2; *see also Carter v. Chicago State Univ.*, 778 F.3d 651, 657 (7th Cir. 2015). Joint Council 25 additionally argues that, as it relates to the two Title VII counts, Morton failed to allege that the joint council, as an affiliate of Local 710, "directed the discriminatory act, practice, or policy of which the employee is complaining." *Worth v. Tyler*, 276 F.3d 249, 260 (7th Cir. 2001). Finally, as to Count I, the § 1981 claim, Joint Council 25 claims that beyond Morton's failure to plead an employment relationship, he also alleged no facts suggestive of Joint Council 25's "*interfer[ence]* with the plaintiff's relationship with his employer"

on account of his race.  *Skylarsky v. Means-Knaus Partners, L.P.*, 777 F.3d 892, 896 (7th Cir. 2015).

In response, Morton dedicates significant briefing to Joint Council 25's separate argument that Count IV should be dismissed under the agency theory[2] that Joint Council 25 never ratified the actions of Coli in his capacity as Trustee of Local 710 – an argument unrelated to its administrative exhaustion theory.  Morton lumps his Title VII and § 1981 arguments under the agency umbrella alongside his LMRDA contention, insisting that all four should survive because "Joint Council 25 had actual knowledge *through its President John T. Coli* and implicitly ratified his actions as Trustee of Local 710…."  Presumably confident in his decision to consolidate his Title VII, § 1981, and LMRDA arguments, Morton reserves a single, underdeveloped paragraph to respond directly to Joint Council 25's arguments stemming from the legal tests of *Knight*, *Worth*, and *Skylarsky*, outlined *supra*.

As best the Court can discern, however, Morton's confidence is supported by but one case from well beyond the confines of our home circuit.  In *Berger v. Iron Workers Reinforced Rodmen Local 201*, the D.C. Circuit held that "the common-law agency principles underlying [§ 301 of the Labor Management Relations Acts] provide the appropriate analytical framework as well under Title VII and § 1981."

---

[2] The Court does not address this aspect of Defendants' brief, since the administrative exhaustion consideration settles the LMRDA claim.  Nonetheless, we do note that LMRDA actions have not been conclusively held to be susceptible to agency analyses, as the Seventh Circuit has yet to decide whether agency principles apply to such claims.  Federal district courts within the Seventh Circuit have, however, adopted such an analytical approach.  *See Darnall v. Dalluge*, 2008 WL 2874716, *4 (C.D. Ill. Jul. 23, 2008) (citing *Phelan v. United Ass'n of Journeymen of Plumbing Indus. Local 305*, 973 F.2d 1050, 1061 (2d. Cir. 1992), a leading Second Circuit opinion that supports the grounding of an international union's LMRDA liability in agency law).

843 F.2d 1395, 1428—29 (D.C. Cir. 1988). The court made clear the ramifications of its holding by stating that, as it would in a suit brought under Title VII, "an international union may be liable under § 1981 if, with knowledge of the surrounding circumstances, it authorizes, ratifies, or approves a local's actions…." *Id*. at 1430. Were *Berger* a Seventh Circuit decision, analysis of Morton's claims might qualify for ratification scrutiny.

However, it is not so apparent to the Court that the agency principles highlighted in *Berger* are the appropriate legal terrain for Title VII and § 1981 disputes in this district. A deeper exploration of the contours of such employment suits brought under Seventh Circuit precedent is required to chart the proper topography for rendering a decision. We address each set of claims in turn.

### A. Counts II & III: The Title VII Claims

Where *Knight*'s five "economic realities" fail to indicate a direct employment relationship in Title VII cases, the Seventh Circuit has routinely marshaled the *Worth* test to determine the level of influence exerted by parent corporations or affiliate organizations over a direct employer. *See Love v. JP Cullen & Sons, Inc.*, 779 F.3d 697, 706 (7th Cir. 2015) ("…cases from this circuit have stated that an entity other than the direct employer may be considered an employer under Title VII if the entity directed the discriminatory act, practice or policy of which [the plaintiff] is complaining"); *Tamayo*, 526 F.3d at 1088 (applying the *Worth* standard to determine the employment relationship between the plaintiff and the Illinois Department of

Revenue ("IDOR"), which controlled the plaintiff's employer's budget); *and E.E.O.C. v. State of Ill.*, 69 F.3d 167, 169 (7th Cir. 1995) ("…the cases in question are the ones in which the defendant so far controlled the plaintiff's employment relationship that it was appropriate to regard the defendant as the de facto or indirect employer…"). The most recent of these cases, *Love*, is particularly instructive.

In *Love*, the Seventh Circuit found that "evidence that a de facto employer 'directed the discriminatory act' is not—without more—enough to establish a de facto employer-employee relationship under Title VII." 779 F.3d at 706. The *Love* court noted that, in *Tamayo*, evidence of the IDOR's "sufficient control over the plaintiff" was paramount to its finding that the IDOR was an employer of the plaintiff. The emphasis on control in *Tamayo* informed the *Love* court's declination to discern an employment relationship from facts depicting a general contractor who "exercised very little control over [the plaintiff] in the course of their relationship." *Id*. Even where the *Worth* direction-of-discrimination consideration held merit, the court nevertheless leaned on the crucial factor of control, stating, "the employer's right to control is the 'most important' consideration in ascertaining the existence of an employer-employee relationship." *Id*. at 703 (quoting *Knight*, 950 F.2d at 378). In light of the control factor's preeminent position in Seventh Circuit jurisprudence, even if actual knowledge or implied ratification could be imputed to an entity such as Joint Council 25, an imputation unsupported by the facts alleged, the Court is unconvinced

that such a finding would ground a cause of action in the absence of additional allegations of control on the affiliate organization's behalf.

Therefore, while the *Berger* decision offers a factually similar predicate case to the instant matter, we decline to adopt its standard, which has existed for thirty years without gaining any traction in the Seventh Circuit. In *Meritor Savings Bank, FSB v. Vinson*, the Supreme Court noted that although courts are "to look to agency principles for guidance in [the Title VII] area," Congress' "intent to place some limits on the acts of employees for which employers under Title VII are to be held responsible" indicates that "common-law principals may not be transferable in all their particulars to Title VII." 477 U.S. 57, 72 (1986). It would appear that the *Knight* court, which came to a decision five years after *Meritor*, explicitly incorporated the Court's tepid endorsement of agency law into its test when it said, "the 'economic realities' test…involves the application of the general principles of agency to the facts." *See Knight*, 950 F.2d at 378. This baking of agency law into the *Knight* test has defined the Seventh Circuit's Title VII caselaw for over twenty-five years, and we find no reason now to stray from its teachings.

In his brief discussion of the topic, Morton effectively concedes that Joint Council 25 does not qualify as an employer under the *Knight* test alone. Instead, Morton contends that Joint Council 25 qualifies for Title VII scrutiny under *Worth*, alleging that it "directed the discriminatory act, practice, or policy of which the employee is complaining." 276 F.3d at 260. The Court finds nothing by way of

allegations in the FAC to either support this notion directly or combat *Love*'s concern for finding such a relationship in the absence of allegations of control. The only inference to be made that is arguably supportive of a finding that Joint Council 25 may have directed discrimination against Morton is that Coli, who Morton claims was primarily responsible for the discrimination, was both Trustee of Local 710 and President of Joint Council 25. However, simply that Coli was an officer of one union while trustee of another does not automatically attribute his misconduct to the affiliate organization. *See Stewart v. Int'l Alliance of Theatrical Stage Emps. Union AFL-CIO*, 2015 WL 5307678, at *2 (N.D. Ill. Sep. 10, 2015) ("The mere fact that [the defendant individuals] were officers of [the defendant organization] when they took the contested actions is insufficient to attribute their conduct to [that organization]"). Because Morton has failed to allege facts sufficient to raise the inference that an employee-employer relationship existed between he and Joint Council 25 under the existing standards promulgated in this circuit's *Knight* and *Worth* decisions, his claim cannot survive. Joint Council 25 is dismissed from Counts II and III.

### B. Count I: The § 1981 Claim

"Like Title VII, § 1981 prohibits discrimination against an employee, and 'the same standards governing liability under Title VII apply to § 1981.'" *Thanongsinh v. Bd. of Educ.*, 462 F.3d 762, 782 (7th Cir. 2006) (quoting *Gonzalez v. Ingersoll Milling Mach. Co.*, 133 F.3d 1025, 1035 (7th Cir. 1998)). A stark difference in the statutes' roots, however, cuts off the agency inquiry for § 1981 claims that was at least

warranted in the Title VII context. Title VII draws its essence from the fundamentals of agency and employment law. *See Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 754—55 (1998). "…§ 1983 and § 1981 are predicated upon fault." *Walker v. Bd. of Regents of Univ. of Wis. Sys.*, 300 F.Supp.2d 836, 849 (W.D. Wis. Jan. 7, 2004) (citing *Hildebrandt v. Ill. Dep't of Natural Res.*, 347 F.3d 1014, 1039 (7th Cir. 2003)). The agency concerns that ripple through Title VII law are of far less concern in a § 1981 claim, which seeks to redress most any harmed individual suffering from the statute's contemplated brand of misconduct, rather than to account strictly for such persons in employment relationships.

Unless Morton has alleged that Joint Council 25 interfered with his relationship with Local 710, his § 1981 claim cannot survive. *See Skylarsky*, 777 F.3d at 896. A close reading of the FAC reveals nothing in the way of any such assertion. Morton details a laundry list of interactions between he, Coli, and Local 710. At no point does he claim that Joint Council 25 sought or attempted to play a role in these interactions whatsoever. As we noted, *supra*, the mere fact that Coli served dual roles in the international union structure does not support a notion that Joint Council 25 necessarily interfered in the relationship between Morton and his local union. Absent an employment relationship, interference on Joint Council 25's behalf needed to have been pled. It was not, and Count I is consequently dismissed as to Joint Council 25.

## CONCLUSION

For the aforementioned reasons, the Court grants Defendants' Motion.  It is so ordered.

Dated: 1/22/2018

_____
Charles P. Kocoras
United States District Judge